IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACQUELINE E. BOWEN, an individual, and STEPHEN T. BOWEN, an individual, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | 4:11CV3163 |
| | ) | |
| v. | ) | |
| | ) | |
| ALLIED PROPERTY AND CASUALTY INSURANCE COMPANY, an Iowa Corporation, d/b/a Allied Insurance, a Nationwide Company, | ) ) ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Jacqueline Bowen ("Jackie") was injured in a car accident in 2007. After recovering the insurance policy limits of $100,000 from the driver who caused the collision, Jackie and her husband, Stephen[1], made a demand for $250,000 from their underinsured motorist insurance carrier, defendant Allied Property and Casualty Insurance Company. After Allied declined to pay the Bowens, Jackie and Stephen Bowen brought this lawsuit for breach of contract, requesting a finding that the monetary value of the Bowens' damages exceeds $350,000 and the entry of judgment against Allied in the amount of $250,000, which is the policy limit. Allied claims that the Bowens are entitled to nothing because their damages are less than the $100,000 they received from the negligent driver's insurance carrier.

---

[1]The plaintiffs' briefs refer to plaintiff Stephen Bowen as "Todd." However, this memorandum and order will refer to him as "Stephen" for purposes of remaining consistent with the case caption.

At issue in this non-jury case is the monetary value of Jackie Bowen's past and future medical treatment, pain and suffering, and lost wages proximately caused by the accident, as well as Stephen Bowen's claim for loss of consortium.[2]

## I.  FINDINGS OF FACT

1.      Plaintiffs Jackie Bowen and her husband, Stephen T. Bowen (the "Bowens"), are residents of Grand Island, Nebraska.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 2.)

2.      Defendant Allied Property and Casualty Insurance Company ("Allied") is an Iowa corporation with its principal place of business in Des Moines, Iowa; is authorized to do business in the State of Nebraska; and does business as Allied Insurance, a Nationwide Company.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 2.)

3.      At all relevant times, the Bowens were insureds under automobile insurance policy number PPC 0014076466-3 (the "Policy") issued by Allied to the Bowens.  The Policy provided $250,000 in underinsured motorist ("UIM") coverage. (Filing 50, Pretrial Conf. Order at CM/ECF p. 2; Trial Ex. 1.)  The Policy stated that Allied "will pay compensatory damages which an 'insured' is legally entitled to recover from the owner or operator of an . . . 'underinsured motor vehicle' because of 'bodily injury' . . . [s]ustained by an 'insured'; and . . . [c]aused by an accident." (Trial Ex. 1, UIM Endorsement at p. 1 of 3.)  The "insured" under the Policy included the Bowens and their family members, and "bodily injury" was defined to mean "bodily harm, sickness or disease, including death that results."  (Trial Ex. 1, Personal Auto Policy at p. 2 of 13.)

---

[2]This memorandum and order shall constitute the findings of fact and conclusions of law required by Fed. R. Civ. P. 52(a)(1).

***Jackie Bowen's Medical Treatment Prior to Collision***

4.      In 1995, while on a vacation with her extended family, Jackie Bowen was tossed by a wave while swimming in the ocean.  She fell off a boogie board and hit her head on the ocean floor.  Jackie's uncle-in-law, a chiropractor, examined her that night.  (Filing 71 at 1:14:20-1:14:30.)  Over the next three years, Jackie sought no further treatment related to her neck, shoulders, back, or any other injury related to the ocean incident.

5.      Beginning in August 1998, Jackie intermittently suffered from headaches and neck, back, and shoulder pain for which she sought medical, chiropractic, and massage treatments.  (Trial Ex. 5.)  Jackie occasionally saw a chiropractor with complaints related to her lower or mid-back, neck, or headaches—care that Jackie related to pregnancies, caring for small children, and her work as a dental hygienist.  (Trial Ex. 5; Filing 71 at 1:16:36-1:17:25, 1:18:38-1:19:05; Filing 72 at 38:30-40:10.)  Between 1998 and September of 2007, Jackie went for several periods of time ranging from 1 to 20 months without any medical, chiropractic, or massage treatment for her neck, back, or shoulders.  (Trial Ex. 5.)  Jackie's medical records from September 20, 2000, indicate that Jackie "has had problems with chronic headaches over the past 5 years" and note that "[s]he was involved in a surfing accident where she struck the ocean floor compressing vertebrae C1 and C2.  Ever since then she has had problems with frontal headache with occipital pressure and tension in her trapezius muscles."  (Trial Ex. 108 at p. 1.)

***The Collision & Subsequent Medical Treatment***

6.      On September 28, 2007, Jackie was involved in a collision while driving east on Stolley Park Road in Grand Island, Nebraska, in her Chevrolet Suburban, which was insured under the Policy.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 2.)  The collision occurred when a Dodge pickup truck being driven by Chris Moser ("Moser") struck the rear of Jackie's vehicle while she was stopped to make a left-

hand turn.  Jackie did not hear brakes or see or hear anything else that indicated Moser attempted to stop his vehicle prior to impact.  (Filing 71 at 59:02-59:36.)  The force of the crash broke the driver's side seat of Jackie's vehicle.  (*Id*. at 59:45-1:00:25.) Jackie described the crash as "loud and violent."  (*Id*. at 58:52- 59:02.)  Both vehicles were totaled.  (*Id*. at 1:03:26-1:03:34.)

7.     The parties admit that the collision was caused by Moser's negligence. (Filing 50, Pretrial Conf. Order at CM/ECF p. 2.)  At the time of the collision, Moser was insured under a policy of automobile insurance issued by Shelter Insurance Company ("Shelter") with a liability limit of $100,000.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 2.)

8.     After the collision with Moser, Jackie's husband took her to the emergency room.  (Filing 71 at 1:05:15-1:05:58.)  There Jackie reported a past medical history of tension headaches and anxiety, that she was taking the medications Elavil for headaches and Lexapro for anxiety, and that she was worried about her neck because she had injured it years ago.  She admitted at trial that the "injury" to which she referred was her 1995 surfing accident.  (Filing 72 at 43:30- 44:26.)  In the emergency room, Jackie felt shaky, weak, and began to experience tightness and muscle pain.  (Filing 71 at 1:06:26-1:07:27.)  After a physical exam and CT scan, Jackie was discharged with pain medication and instructions to follow up with her regular doctor.  (*Id*. at 1:06:00-1:06:20, 1:07:27-1:07:57.)  Jackie did not engage in any activities over the weekend, including Sunday, when she would normally lead worship at church.  (*Id*. at 1:07:59-1:08:48.)

9.     About a week after the collision, Jackie followed up with her family physician, Dr. Cannella.  (*Id*. at 1:36:42-1:37:12.)  Jackie felt neck and shoulder pain in addition to tingling in her right hand and fingers.  (*Id*. at 1:37:12-1:37:40.)  Dr. Canella prescribed muscle relaxants.  (*Id*. at 1:36:42-1:37:12.)  When Jackie's symptoms failed to resolve, Dr. Canella referred her to a neurologist.  (*Id*. at 1:37:40-1:38:05.)  The neurologist performed a nerve conduction study and referred

4

her to physical therapy. Ultimately, the neurologist sent Jackie to see Dr. Lindley at the St. Francis specialty clinic. (*Id*. at 1:37:55-138:57.)

10. Beginning in November 2007, Dr. Lindley engaged in a series of treatments designed to help diagnose the cause of Jackie's ongoing pain and provide pain relief. (*Id*. at 1:49:44-1:50:34; Trial Ex. 7 at 8:22, 18:9-19:12.) Initially, Dr. Lindley's treatment plan consisted of physical therapy, massage therapy, muscle relaxants, and opiate pain medications. (Filing 71 at 1:55:20-1:56:27; Trial Ex. 7, Dep. David A. Lindley, D.O., at 6:22-28:14 (describing Dr. Lindley's treatment).)[3] When Jackie's condition continued to linger, Dr. Lindley started on a course of more invasive procedures including a right occipital nerve block, right suprascapular nerve block, trigger point injections followed by physical therapy, Botox injections, right cervical medial branch block, pulsed radio frequency, fluoroscopic guided OA and AA joint injections, and cervical epidural steroid injections. (Filing 71 at 1:44:00-1:55:00.) After 10 months of treatment, and when it was evident that none of these treatment and diagnostic modalities brought significant and long-term relief to Jackie, Dr. Lindley discussed with Jackie a spinal cord stimulator trial. (*Id*. at 1:59:21-2:00:40; Trial Ex. 7 at 23:4-16, 26:18-25, 27:6-20.) Dr. Lindley explained that "one of the benefits of spinal cord stimulation" is "[y]ou get to try it first." (Trial Ex. 7 at 29:21-22.) "[I]f you decide that [the stimulator] really improves your pain and improves your life and improves your function, then you can elect to undergo the implant which is . . . putting the device under the skin so you can keep it there." (Trial Ex. 7 at 29:25-30:6.)

11. Jackie believed that Dr. Lindley's recommendations appeared reasonable, and Jackie followed his medical advice. (Filing 71 at 1:57:15-1:57:51.)

---

[3]I did not consider the portion of Dr. Lindley's testimony to which the defendant objects. (Trial Ex. 7 at 16:10-13.)

12.    Dr. Lonser took over Jackie's care when Dr. Lindley accepted a position as the Director of the Pain Management Fellowship at the University of Miami.  (*Id.* at 2:00:48-2:00:52; Trial Ex. 7 at 28:10-21.)  Dr. Lonser also encouraged Jackie to consider a spinal cord stimulator.  (Filing 71 at 2:00:54-2:01:22.)  Jackie passed a psychological evaluation for the spinal cord stimulator and had a trial stimulator implanted in which the leads were placed in the epidural space of her spine, but the battery unit remained outside her body.  (*Id.* at 2:01:22-2:02:38.)  The trial stimulator provided significant pain relief to Jackie, so Dr. Lonser recommended the surgical placement of a permanent stimulator.  (*Id.* at 2:02:38-2:04:50; Trial Ex. 7 at 31:18-32:22.)  The permanent stimulator was also initially effective, but failed to provide long-term pain relief due to the migration of the leads that were placed in her cervical spine.[4]  (Filing 71 at 2:04:50-2:08:17; Trial Ex. 7 at 32:6-34:1.)  Subsequently, Jackie had the spinal cord stimulator removed.  (Filing 71 at 2:08:17-2:08:30; Trial Ex. 7 at 34:20-24.)

13.    Dr. Perez took over Jackie's care when Dr. Lonser left the pain clinic.  (Filing 71 at 2:09:32-2:09:47; Trial Ex. 7 at 34:25-35:7.)  Dr. Perez began a new course of treatment consisting of aggressive physical therapy and extended-release muscle relaxants.  (Trial Ex. 9, Dep. Pedro Perez, M.D., at 109:20-112:17; Trial Ex. 7 at 35:8-18.) Dr. Perez discontinued opiate pain medications and prescribed physical and aqua therapy three times a week in combination with Amrix, Nortriptyline[5], and

---

[4]Dr. Lindley testified that one of the recognized risks of implanting a spinal cord stimulator in the cervical spine is lead migration.  Based on Dr. Lindley's review of subsequent x-rays, he determined that lead migration was ultimately what caused Jackie's stimulator to become ineffective.  (Trial Ex. 7 at 33:14-34:21.)

[5]Jackie Bowen experienced chronic tension/stress headaches since her college years, of which her mother and grandmother also suffered. (Filing 71 at 1:19:45-1:20:45; Filing 72 at 8:45-9:05.)  She was prescribed Amitriptyline for her headaches by her regular medical provider prior to the accident, and she found the drug to be effective for treating her headaches. (Filing 71 at 1:19:45-1:20:45.) Jackie was taking Amitriptyline at the time of the accident for her headaches, and she admitted that the

Flector patches. (Filing 71 at 2:09:47-2:10:13, 2:14:15-2:19:28; Trial Ex. 9 at 31:15-18; 108:8-24.) The aqua therapy component included myofasical stretching. (Filing 71 at 2:19:33-2:20:32.) Under Dr. Perez's care, Jackie made progress toward her pre-collision condition until she was forced to stop physical therapy due to financial reasons. (*Id.* at 2:18:39-2:19:16; Trial Ex. 9 at 111:12-112:17.) Jackie's condition has regressed since she stopped physical therapy. (Filing 71 at 2:20:32-2:22:11.)

14.    If the appropriate witnesses were called to testify by the plaintiffs, such witnesses would testify that Jackie Bowen has incurred $179,410.65 in medical bills, but whether such medical services were necessary remains at issue.[6] Similarly, if the appropriate witnesses were called to testify by the plaintiffs, such witnesses would testify that Jackie Bowen's past lost wages from the date of the accident to the present are $6,565.00. (Filing 50, Pretrial Conf. Order at CM/ECF p. 3.) Jackie's prescribed

---

Nortriptyline she is taking now is a replacement for the Amitriptyline she was taking prior to the accident. (Filing 72 at 9:24-10:05; Trial Ex. 103, Dep. Phillip E. Essay, M.D., at 66:6-19 ("nortriptyline is a very close equivalent to the amitriptyline, and I believe it was started as a replacement of the amitriptyline").) Jackie Bowen has spent $118.63 for Nortriptyline from November 9, 2010, to June 2, 2012. (Trial Ex. 2, List of Payments for Drugs from Walgreen's Pharmacy.)

[6]The parties originally stipulated that Jackie's medical expenses since the accident totaled $191,146.65. However, this amount was reduced by $11,736.00 in expenses for neuromuscular reeducation which are not related to the accident and which were inadvertently included in the total medical bills by Plaintiffs' counsel. As explained in Defendant's trial brief, "Although the medical bills incurred by the Plaintiff . . . were fair and reasonable for the services rendered, not all of the medical bills that plaintiff has put at issue in this case were medically necessary for the treatment of the injuries she allegedly sustained in the accident." (Filing 75 at CM/ECF p. 2; Filing 79, Def.'s Post-Trial Reply Br. at CM/ECF p. 7 (for purposes of establishing foundation, Allied stipulated medical bills were fair and reasonable for treatment received, but that "**does not mean** that the reasonableness of the treatment itself is undisputed" (emphasis in original).)

future treatment consists of physical and aqua therapy three times a week in combination with Amrix, Nortriptyline, and Flector patches. (Trial Ex. 9 at 124:1-3; Filing 71 at 2:18:25-2:19:30.)  The cost of this treatment is $4,323.00 per month. (Trial Ex. 2; Filing 71 at 2:24:50-2:25:49.)  Jackie is 40 years old with a life expectancy of 37.91 years.[7]  (Filing 72 at 3:30-3:36.)

### *Physicians' Opinions*

15.    Dr. Goldner is a board-certified neurologist who performed an independent medical examination of Jackie Bowen on May 14, 2012.  He does not have training or certification in anesthesiology or pain management, and he stated that "pain management doctors use different modalities, and they approach it in a different way." (Trial Ex. 100, Dep. John C. Goldner, M.D., at 23:22-24:12, 26:12-14.)  Dr. Goldner spent 40 minutes[8] with Jackie Bowen personally, three to four hours reviewing her medical records, and one hour writing his report.  (Trial Ex. 100 at 18:25-19:14.)

16.    Dr. Goldner testified that 70 percent of Jackie's "musculoskeletal problems" are related to a preexisting condition caused by the 1995 ocean incident, and 30 percent of her problems were caused by the 2007 collision.  (Trial Ex. 100 at 30:15-32:5.)

---

[7]Jackie's life expectancy is taken from the Commissioners 1980 Standard Ordinary Mortality Table, cited in Plaintiffs' brief, but not offered or received as evidence at trial.  (Filing 76 at CM/ECF p. 5 n.3.)  Defendant does not object to Plaintiffs' reference to this table.  *See* Neb. Rev. Stat. § 44-404 (referring to Commissioners 1980 Standard Ordinary Mortality Table).

[8]Dr. Goldner stated that his physical examination of Jackie took six to ten minutes and reviewing her medical history with her took 20 to 30 minutes.  (Trial Ex. 100 at 9:16-10:13.)

> I feel that she suffered, in the accident of September 28th, 2007, a mild musculoskeletal injury to her neck and her right scapular area, the right shoulder blade, and I think this aggravated her preexisting musculoskeletal problems, and I consider that it probably aggravated it by a factor of a third. I said 30 percent.

(Trial Ex. 100 at 31:10-16.) Dr. Goldner believes that the type of injury Jackie received from the 2007 collision "generally responds to treatment in two to four months." Therefore, the treatment Jackie had from the date of the 2007 accident until January 1, 2008, "was due to the exacerbation of her musculoskeletal symptoms from the accident of September 28th, 2007," but treatment after January 1, 2008, "was unrelated to the accident of September 28th, 2007" and was instead necessitated only by "her chronic musculoskeletal problem that was manifest both by headaches and right neck pain." (Trial Ex. 100 at 31:17-32:5, 86:14-19.)

17.    Dr. Goldner added that Jackie's 1995 ocean injury

> was a possible mechanism [that led to her musculoskeletal symptoms]. I'm not sure that anyone can ever truly say to a reasonable degree of medical certainty why people start having musculoskeletal symptoms. They can—it can occur with an injury. It can occur with stress. It can recur—occur with arthritic changes. All sorts of things can trigger musculoskeletal injuries. But [Jackie Bowen] clearly was having these symptoms, as documented, prior to the accident of September 28th, 2007.

(Trial Ex. 100 at 40:11-41:3.)

18.    Dr. Goldner admitted that his 70-30 apportionment opinion is "an estimate"; that he would have preferred to have said that Jackie's injury was "worse" instead of trying "to quantify it specifically"[9]; that "[t]here's always room to argue"

---

[9]Defendant's relevance objection to this testimony is overruled. (Trial Ex. 100 at 47:18-22.)

that the percentages could be switched around—that is, that the September 28, 2007, accident aggravated Jackie's preexisting condition by 70 percent instead of 30 percent; and that "you're asking me to give an objective opinion based on subjective findings. It can't be done."  (Trial Ex. 100 at 47:12-48:12, 59:14-16.)

19.    Dr. Lindley, one of Jackie Bowen's treating physicians who is board-certified in both anesthesiology and pain management, disagrees with Dr. Goldner's apportionment opinion:

> I have no idea how he would come up with such numbers.  And prior to the accident, . . . she had various aches and pains and had intermittent therapies but never sought the care of pain management, to my knowledge.  It was mainly chiropractic and massage.  Never . . . had pain to the degree that she was needing or undergoing procedures or . . . physical modalities to the intensity that Dr. Perez prescribed.

(Trial Ex. 7 at 38:4-13.)

20.    Defendant's expert, Dr. Phillip Essay, is board-certified in anesthesiology and pain medicine.  (Trial Ex. 104.)  Dr. Essay did not obtain a medical history from Jackie Bowen, nor did he conduct a physical examination of her.  After reviewing written evaluations by Jackie's physicians, treatment notes, diagnostic and operative reports, physical therapy notes, and the depositions of Jackie and Stephen Bowen, Dr. Essay concluded that "[t]here were certain things that were used to treat Mrs. Bowen that in the majority of circles in pain medicine are not accepted as . . . medically necessary or medically indicated" for Jackie Bowen's diagnosis of myofascial pain[10],

---

[10]According to Dr. Perez, myofascial pain syndrome is when "[s]omething triggers . . . an abnormal pathological contraction of the muscle. . . . [T]he areas of contraction that's going to limit the blood flow to the muscles, there's going to be accumulation of metabolites that trigger even a worse contraction that further limits the blood flow, to then a contraction, so it's a vicious circle."  (Trial Ex. 9 at 67:20-68:13.)

such as "pulsed radiofrequency neurotomy, spinal cord stimulation, a supraclavicular nerve block, and . . . physical therapy . . . that went on for long periods of time with no clear monitoring and that did not appear to have effectiveness."  (Trial Ex. 103, Dep. Phillip E. Essay, M.D., at 18:18-19:8.)  According to Dr. Essay, while physical and aqua therapy are "reasonable form[s] of therapy to initiate, to see how the patient responds," the ultimate goal of those therapies is to "get the patient back to a functional status where she can function independently, either of her own choosing to pursue water therapy in an ongoing basis . . . but to continue it in perpetuity . . . is inappropriate." (Trial Ex. 103 at 46:15-47:6.)  "Part of treating chronic pain is helping patients . . . to identify things that they can do independently to help themselves." (Trial Ex. 103 at 47:14-20.)  Dr. Essay believes that Jackie's physical and aqua therapy were appropriate for 90 days.  (Trial Ex. 103 at 60:21-61:25.)  Dr. Perez, one of Jackie Bowen's treating physicians, agreed that "[u]sually, after the initial three months of physical therapy or whatever amount of physical therapy the patient can afford . . . we take a break and we see what happens. . . . and if the pain recurs then they have to go back."  (Trial Ex. 9 at 70:2-10.)

21.    With regard to the spinal cord stimulator, Dr. Essay testified that it is "a very effective form of therapy in the treatment of neuropathic pain, in other words, pain that is occurring because of nerve injury or nerve dysfunction.  That was not the diagnosis of Mrs. Bowen."  (Trial Ex. 103 at 27:18-23.)  In Dr. Goldner's opinion, "the spinal stimulator that was implanted was unnecessary and obviously was of no benefit since it's been removed, and I cannot relate that to the accident of September 28th, 2007."  (Trial Ex. 100 at 32:6-10.)

22.    Dr. Perez, who is board-certified in anesthesiology[11], has not "seen an indication" for the use of "invasive procedures like the nerve blocks or the radio pulsed frequency" for Jackie Bowen because he has not "seen any indication of any

---

[11]At the time of trial, Dr. Perez planned to take the examination to become board-certified in pain medicine in 2012.  (Trial Ex. 8; Trial Ex. 9 at 11:14-17.)

different diagnosis than myofascial pain"[12] since he began Jackie's medical care. Because of this diagnosis, "there's no indication for any other procedures than . . . what I've been doing and the trigger point injections," especially "since she's been doing fine with the initial treatment." (Trial Ex. 9 at 124:12-126:22.) Dr. Perez testified that Jackie's treatment under his supervision consisted of physical therapy, Amrix, Flector patches, and Nortriptyline, and she should be "followed every six months . . . to reevaluate and see if she needs to continue or not." (Trial Ex. 9 at 124:1-11, 128:6-16.) Dr. Perez thinks that "physical therapy is really the primary treatment for myofascial pain," as well as "the most effective treatment" for that type of pain. (Trial Ex. 9 at 127:24-128:4.)

23.    Regarding the types of treatment other physicians gave Jackie before he began her care, Dr. Perez stated: "I just want to make clear . . . I just don't feel comfortable critiquing other people's approaches to problems because . . . everyone is different and in pain management specifically, . . . we really do what we can . . . and try to help them." (Trial Ex. 9 at 77:13-18.) While Dr. Perez generally believes that conservative treatment should be tried before more invasive therapies, there

> might be some exceptions. . . . [T]he patient says, well, I've tried all that and nothing is working, it's whatever you want. See, all these invasive modalities . . . it's something we try and see what the result is and I make sure the patient understands this. So if the patient says . . . I've tried all this and nothing has worked, then I might tell the patient . . . your next step will be to do this. . . . I explain the risks, benefits and explain to them that this might do nothing for them, but it's something we can try and I'll let the patient decide.

(Trial Ex. 9 at 42:6-24.)

---

[12]Dr. Goldner testified that "myofascial" is "another way of saying musculoskeletal." (Trial Ex. 100 at 76:9-11.)

24.     Dr. Lindley believes that all treatment delivered by him, Dr. Lonser, and Dr. Perez was medically necessary, reasonable, and appropriate to treat the injuries Jackie Bowen suffered as a result of the September 2007 car accident. (Trial Ex. 7 at 36:1-14.) With specific regard to the spinal cord stimulator, Dr. Lindley testified that Jackie "had tried extensive conservative care and had ongoing pain. . . . She had a good trial, and that was proof that it was reasonable therapy to put in." (Trial Ex. 7 at 37:7-11.)

### *Lifestyle After Collision*

25.     Jackie Bowen's pre-accident pain in her back, neck, and shoulder differed in type, quality, and intensity than her post-accident pain in the same areas of her body. Further, prior to the September 2007 collision, Jackie's activities were not limited due to ongoing neck, back, and shoulder pain, and she never considered her headaches and other pain to be debilitating. (Filing 71 at 2:24:11-2:24:50; Filing 72 at 1:20:19-1:22:20.) Since the collision, Jackie feels that she is physically restricted from engaging in certain activities and must make conscious choices about what she can and cannot do. (Filing 71 at 2:24:11-2:24:50.) Now, if she engages in certain activities, she has to forgo others. (*Id*. at 2:24:11-2:24:50; Filing 72 at 3:36-4:58, 1:34:32-42.)

26.     At trial Jackie described the difference in her pain before and after the accident:

> [The pain is] different in intensity and different in the amount of debilitating effect that it has. So, prior to the accident I wasn't not doing things because of my pain, but following the accident the intensity or . . . it would make me more tired or actually have more pain doing more things. Actually made me stop doing things that I'd done before the accident. . . . I don't really even think of it as the same type of pain because it wasn't something I thought, honestly that I thought a whole lot about before the accident. It was just kind of like you're an active

person and you have little toddlers and little kids that I'm picking up and down and so I'm thinking this . . . is kind of . . . you don't think anything particularly about it. You just think, well, this is just life . . . having little kids and being active is what I'd say before. Where after, it's something I think about all the time. It's a 24/7 kind of thing. Whether it's restricting me or not restricting me, it's something that it's not all I think about, but it's part of everything I do and everything that I have become. . . . It is kind of more of a central focus in my life because it's become more debilitating.

(Filing 72 at 1:10:29-1:12:48.) Jackie credibly discussed the effect of this pain on her activity level:

[B]efore the accident I didn't have to make—I never had to make choices as far as what I could do within a day's time. If I planned to do something, I did it. I didn't have to sort of weigh what one activity was going to cost me and mean that I couldn't do another activity later that day.

(Filing 71 at 2:24:07-2:24:50.)

27.    Jackie's husband, Stephen, is a pastor of church in Grand Island, Nebraska. (Filing 72 at 1:28:23-1:28:51.) Jackie's limitations caused by the collision forced Stephen to scale back his ministry responsibilities and increase his responsibilities in the Bowen's seven-person household.  (*Id*. at 1:28:51-1:30:35.) Jackie's injuries have also detrimentally impacted the Bowens' marital intimacy.  (*Id*. at 1:31:02-1:32:11.)  Stephen Bowen described his wife's physical condition after the accident as follows:

I would say because of the limitations on her activity due to . . . her report of feeling pain and being able to just observe what she's able to do and even then just before having to rest and recuperate in active . . . waking hours.  They're not the same and even just even when she is active and doing things, . . . I recognize this is subjective, but I feel as

14

her husband I can tell when she's pushing through when she's hurting and she's struggling she's just doing it anyway.  That's different than before.

(Filing 72 at 1:32:11-1:33:23.)

28.    Defendant Allied, through counsel, does not deny that Jackie Bowen's pain is real and intense:

Q:    [Court] So, if we sit here today, it's not the position of the Defendants that this lady is being untruthful regarding her complaints of pain?

A:    [Counsel]  No.

(Filing 71 at 48:29-48:41.)

### *Insurance Payments*

29.    Shortly before October 28, 2010, Shelter offered to tender Moser's liability limit of $100,000 to Jackie Bowen.  On October 28, 2010, the Bowens notified Allied of Shelter's conditional tender of Shelter's policy limits and offered Allied the opportunity to substitute its payment for Shelter's payment under Neb. Rev. Stat. § 44-6412(2).  On November 24, 2010, Allied notified the Bowens that Allied waived its right to substitute payment, and the Bowens accepted Shelter's policy-limit payment of $100,000 on Moser's behalf.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 3.)

30.    On August 12, 2011, the Bowens made a demand upon Allied for payment of $250,000 in underinsured motor vehicle benefits under the Policy, and Allied declined to pay the Bowens.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 3.)

## II.  CONCLUSIONS OF LAW

### A.     *Preliminary Issues*

Because federal jurisdiction in this case is based on diversity of citizenship, state law controls the interpretation of the insurance policy at issue.  *DeAtley v. Mutual of Omaha Ins. Co.*, No. 12-1068, slip op. at 3-4, 2012 WL 5476219 (8th Cir. Nov. 13, 2012).

### 1.     *Loss-of-Consortium Claim*

Allied contends that Stephen Bowen may not assert a claim for loss of consortium because such damages are not recoverable under the Policy.  (Filing 50, Pretrial Conf. Order at CM/ECF p. 4.)  Accordingly, Allied has filed a motion to exclude "all evidence of, and reference to, Mr. Bowen's alleged damages" for "the loss of consortium, society, comfort and companionship of his wife and the loss of various household and domestic services" as a result of the accident.  (Filing 52 at CM/ECF p. 1.)

In Nebraska, "[l]oss of consortium claims are derivative." *Rasmussen v. State Farm Mut. Auto. Ins. Co.*, 770 N.W.2d 619, 629 (Neb. 2009).  That is, the loss is "a byproduct of and entirely dependent upon the bodily injury" of another. *Farm Bureau Ins. Co. v. Martinsen*, 659 N.W.2d 823, 829 (Neb. 2003).  "There are not two separate injuries." *Rasmussen*, 770 N.W.2d at 629.  Because loss-of-consortium claims are derivative, Stephen Bowen's loss is not a separate bodily injury that would provide additional coverage under the Policy, but is compensable as part of Jackie Bowen's per-person coverage.  *Id.*  *See Martinsen*, 659 N.W.2d at 828-29 (parents' claim of emotional distress arising from son's injuries and eventual death after car accident was derivative of son's injury and could be "properly combined with the damage award for their son's injuries under the $300,000 'per person' limit of the policy," but no further payment was available where insurance company had already paid full per-

person limit for son's medical expenses); *Wilson v. Capital Fire Ins. Co.*, 286 N.W. 331, 332-33 (Neb. 1939) (value of husband's loss of injured wife's services and companionship was recoverable under automobile liability insurance policy as consequential damage, but no further damages could be awarded where full per-person policy limit had already been paid); 12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 171:5 (3d ed. 2012) ("UM/UIM coverage allows recovery for loss of consortium. Litigation of this issue often centers on whether or not the loss of consortium and the underlying physical injury constitute a single claim or separate claims. If they are the same claim, the recovery is limited by the 'per claim' limit whereas taken as separate claims the 'per occurrence' limit would apply. A loss of consortium claim can be brought by a party other than the injured insured.") (footnotes omitted).

Because Stephen Bowen's claim for loss of consortium is derivative of the bodily injury suffered by his wife, the Bowens are entitled to present evidence of all damages stemming from the bodily injury to Jackie Bowen, including Stephen Bowen's loss of consortium. However, the Bowens' recovery will be limited to the $250,000 per-person limit of the Allied Policy.[13] Therefore, Allied's Motion to Exclude (Filing 52) evidence regarding Stephen Bowen's alleged loss of consortium will be denied.

### 2.    *Exclusion of Some of Dr. Essay's Expert Opinions*

Allied has filed a statement of objections (Filing 66) to Magistrate Judge Zwart's order (Filing 65) finding that (1) Dr. Philip Essay's additional expert report dated July 19, 2012, was untimely; (2) Dr. Essay's additional expert report was in the nature of a new opinion, not a correction or explanation of a prior opinion; (3) Dr.

---

[13]The plaintiffs acknowledge that they "do not seek to trigger the additional per occurrence coverage under the policy." (Filing 64, Pls.' Br. Opp'n Def.'s Mot. Exclude at CM/ECF p. 5.)

17

Essay's additional report caused prejudice to the plaintiffs; and (4) two of the three opinions[14] contained in Dr. Essay's July 19, 2012, report should be excluded.

Because I conclude that Magistrate Judge Zwart's nondispositive pretrial order is not "clearly erroneous or contrary to law," I shall deny Allied's statement of objections. (Filing 66.)  28 U.S.C. § 636(b)(1)(A);  Fed. R. Civ. P. 72(a). Accordingly, I have not considered those portions of Dr. Essay's July 2012 second expert report that state (1) that all or part of Jacqueline Bowen's chronic neck and upper back pain existed prior to the September 28, 2007, accident and (2) that Jacqueline Bowen's opiate prescriptions were not medically necessary after April 30, 2008.  I have, however, considered Dr. Essay's opinion regarding the propriety and necessity of suprascapular nerve blocks for treating Jackie Bowen's injuries.  (Filing 65, Magistrate Judge's Mem. & Order.)

## B.    *Monetary Value of Plaintiffs' Damages*

The parties agree that since the date of the accident, Jackie Bowen has incurred $179,410.65 in medical bills and $6,565.00 in lost wages.  However, Allied disputes the nature, extent, and proximate cause of these alleged injuries and damages. Specifically, Allied argues that: (1) not all of these medical expenses were necessary for the treatment of injuries Jackie Bowen allegedly sustained in the accident because some of the medical expenses were incurred to address conditions that were unrelated to the accident, some were related to pre-existing injuries that were merely exacerbated by—not caused by—the accident, and some were not medically necessary

---

[14]Magistrate Judge Zwart ruled that Dr. Essay could not testify "that all or part of Jacqueline Bowen's chronic neck and upper back pain existed prior to the September 28, 2007 accident" or "that opiate prescriptions were not medically necessary after April 30, 2008."  (Filing 65 at CM/ECF p. 9.)  However, Magistrate Judge Zwart allowed Dr. Essay to "testify regarding the propriety and necessity of suprascapular nerve blocks for treating Jacqueline Bowen's injuries."  (Filing 65 at CM/ECF p. 10.)

or appropriate for the nature of Jackie Bowen's alleged injuries; and (2) Jackie Bowen's alleged lost wages were not proximately caused by the collision. (Filing 75, Def.'s Trial Br. at CM/ECF pp. 2-3.)

The Bowens maintain that because Allied has not proved that damages caused by Jackie's alleged preexisting condition can be separated from damages caused by the collision, Allied is responsible for all damages caused by the responsible driver's negligence up to the Policy limits, including damages caused by the exacerbation of a preexisting condition. The Bowens submit that even if I were to accept Allied's claim that only 30 percent of Jackie's damages were caused by the collision, her total damages still exceed Allied's Policy limits. Further, the Bowens argue that simply because various medical providers disagree about the most appropriate or effective treatment for Jackie's condition does not make Jackie's treatment medically unreasonable. (Filing 76, Pls.' Post-Trial Br. at CM/ECF p. 6.)

In order to recover against Allied on the Policy, the Bowens must prove, by the greater weight of the evidence, that Chris Moser (the driver whose car hit Jackie's vehicle) was negligent; that this negligence was a proximate cause of the collision; that the collision was a proximate cause of some damage to the Bowens; and the nature and extent of that damage. NJI2d Civ. 2.01(B) (West 2012). Allied does not contest that Moser's negligence was the proximate cause of the September 28, 2007, collision between Moser and Jackie Bowen, or that the collision was a proximate cause of some damage to the plaintiffs. Therefore, the issues for decision are (1) whether the collision aggravated a preexisting condition for which damages can be apportioned, and (2) whether all of Jackie Bowen's treatment was medically necessary. If Jackie and Stephen Bowen's damages are found to be equal to or less than the $100,000 they have already received from Shelter Insurance Company on behalf of Chris Moser, then the Bowens are not entitled to receive additional money from defendant Allied.

19

### 1.    Preexisting Condition

In an action for damages for personal injuries caused by a wrongful act or omission, the injured person is entitled to recover full compensation for all damage proximately resulting from the defendant's act, even though his injuries may have been aggravated by reason of his preexisting physical or mental condition, rendered more difficult to cure by reason of his state of health, or more serious, because of a latent disease, than they would have been had he been in robust health. The defendant cannot invoke the previous condition of the person injured for the purpose of escaping the consequences of his own negligence or reducing the damages for which he is liable. The right of a person suffering from a disease, who is injured by reason of the negligence of another, to recover for all damages proximately resulting from the negligent act, includes the right to recover for an aggravation of that existing disease.

*McCall v. Weeks*, 164 N.W.2d 206, 210 (Neb. 1969).

The Nebraska Supreme Court has consistently held "the right of a person suffering from a preexisting condition who is injured by reason of the negligence of another to recover for all damages proximately resulting from the negligent act includes the right to recover from an aggravation of the preexisting condition." *Wasiak v. Omaha Pub. Power Dist.*, 568 N.W.2d 229, 234 (Neb. 1997) (citing *Ketteler v. Daniel*, 556 N.W.2d 623 (Neb. 1996); *Kirchner v. Wilson*, 554 N.W.2d 782 (Neb. 1996); *David v. DeLeon*, 547 N.W.2d 726 (Neb. 1996). *See also Castillo v. Young*, 720 N.W.2d 40, 46 (Neb. 2006) ("if a plaintiff has a preexisting condition and the defendant's conduct resulted in greater damages because of that preexisting condition, the defendant is nonetheless liable for all damages proximately caused by the defendant's conduct").

Allied is responsible for all damages Jackie Bowen suffered as a result of the injuries she sustained in the collision unless Allied can satisfactorily prove that the

damages "caused by the preexisting condition can be separated from those caused by the accident." *DeLeon*, 547 N.W.2d at 729. "Once the plaintiff presents evidence from which a jury reasonably can find that damages were proximately caused by the tortious act, the burden of apportioning damages resulting from the tort rests squarely on the defendant." *DeLeon*, 547 N.W.2d at 730; *Higginbotham v. Sukrup*, 737 N.W.2d 910, 917 (Neb. Ct. App. 2007).

If there is any uncertainty regarding whether the injuries can be apportioned, the doubt is resolved against the defendant. Under "*DeLeon*, all . . . injuries are attributed to the defendants unless the defendants present evidence contradicting such an assumption. The uncertain interaction between negligence and preexisting condition does not require speculation on the part of the [fact-finder], because *DeLeon* resolves uncertainty against the defendants." *Synder v. Contemporary Obstetrics & Gynecology, P.C.*, 605 N.W.2d 782, 798 (Neb. 2000).

Allied relies on the opinion of Dr. Goldner that 70 percent of Jackie's injuries are related to a preexisting condition and 30 percent were caused by the collision. Dr. Goldner acknowledged that despite his testimony that  Jackie's damages could be apportioned between her preexisting condition and the damages caused by the accident, he normally would not, in practice, attempt to quantify the exacerbation of a preexisting injury, but only did so in this case at the encouragement of Allied's counsel. (Trial Ex. 100 at 47:12-22.)

> A.    You basically are making an estimate. It—there is no way of being —I was asked and I was told that it was important that I try to give some quantification to this because it was incumbent on—in this report that I make a statement to—in that respect, and that's why I put that down.

> Q.    If you had not been asked to do that, would you typically try and come up with a quantification like that?

A.    I would have said it was worse.  I would have not tried to quantify it specifically.

. . . .

Q.    So when we talk about the—this 30 percent, 70 percent, is it possible that they could be switched, could be 70 percent, 30 percent?

A.    There is always room to argue.

(Trial Ex. 100 at 47:12-48:12.)

Dr. Goldner also forthrightly acknowledged the inherent unreliability in attempting to divide the portion of an injury related to a preexisting condition and that part caused by a trauma, particularly when the injury involves subjective complaints of pain and is not accompanied by objective medical findings, as in this case:

A.    I am not convinced that there is anything authoritative. We use guides because you have to get somewhere, but I will tell you that in having used the guides through six editions, they don't keep writing new editions because they got it right. They keep writing new editions because they've got it wrong and they're trying to make it better. We're a long way from truth as it relates to that. And so much of it is subjective.

Q.    And it's based on your subjective interpretation, not any objective findings or things like that?

A.    She has no objective findings. . . . So you're asking me to give an objective opinion based on subjective findings. It can't be done.

(Trial Ex. 100 at 58:19-59:16 (emphasis added).)

Treating physician Dr. Lindley testified that it is not possible to apportion Jackie's damages between any possible preexisting problem and the injuries she

22

sustained in the collision. With regard to Dr. Goldner's 70/30 apportionment opinion,
Dr. Lindley stated:

> I agree she had various aches and pains [prior to the collision], but I
> believe they were different in quality, location, the effect on her life, and,
> you know, generally different intensity and limiting-type symptoms.
>
> . . . .
>
> I have no idea how [Dr. Goldner] would come up with such numbers.
> And prior to the accident . . . she had various aches and pains and had
> intermittent therapies but never sought the care of pain management, to
> my knowledge. It was mainly chiropractic and massage.  Never, you
> know had pain to the degree that she was needing or undergoing
> procedures or . . . physical modalities to the intensity that Dr. Perez had
> prescribed.

(Trial Ex. 7 at 37:17-38:4-13.)

In contrasting Jackie's prior condition with her post-collision condition, Dr.
Perez—also one of Jackie's treating physicians—stated:

> [W]hen I looked at [Exhibit 5][15] I just noticed right away it's—this is
> more of an intermittent issue and something must have changed between
> all this and the point where you decide to go to a chronic pain clinic.
> Again, is it a coincidence?  It's possible, I guess, I mean but the fact that
> there's an accident involving the same time period, you know, raises the
> possibility that this is an exacerbation after the accident. . . . as a pain
> specialist you really have to think of it because we see this all the time.
> I have a little bit of a problem, with my back, but all of a sudden
> something happened, boom, and this is when everything triggered this
> big problem.

---

[15]Trial Exhibit 5 is a summary of Jackie Bowen's medical history in list form
which shows dates and locations of treatment and reasons for treatment.

23

(Trial Ex. 9 at 130:7-24.)

In evaluating the opinions on apportionment offered by Allied, "the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Lynn v. Metro. Util. Dist.*, 403 N.W.2d 335, 338 (Neb. 1987).

By his own admission, Dr. Goldner agrees that his apportionment percentage is an estimate based on purely subjective factors, and there are no medically authoritative works governing how to apportion damages between a preexisting condition and a new injury, especially when the injury is unaccompanied by objective medical findings, as in this case. Dr. Lindley offered his opinion that it is not possible to do so. Further, Dr. Goldner's opinion is contradicted by Jackie's past medical history, the nature of her medical treatment, and Jackie and her husband's description of how she felt in the years prior to the 2007 collision and the years after the 2007 accident.

Given the conflicting evidence and the legal requirement that any uncertainty in apportionment be resolved against Allied, I conclude that Allied has failed to establish that damages related to any preexisting condition can be separated from the damages Jackie suffered in the accident. *Synder*, 605 N.W.2d at 798. As a result, Allied is responsible for all of Jackie's damages.

## 2.   *Medical Necessity of Treatment*

The Bowens are entitled to recover an amount of damages that will fairly compensate them for injury proximately caused by Chris Moser, the driver who was responsible for the September 28, 2007, collision, including the "reasonable value of the medical care and supplies reasonably needed by and actually provided to the plaintiff (and reasonably certain to be needed and provided in the future)." NJI2d Civ. 4.01 (West 2012). "As a general matter, the proper measure of damages in a negligence action is that which will place the aggrieved party in the position in which

24

he or she would have been had there been no negligence." *World Radio Laboratories, Inc. v. Coopers & Lybrand*, 557 N.W.2d 1, 13 (Neb. 1996). "Regarding future medical expenses, the amount need not be established with exact certainty. The need for future medical services and the reasonable value thereof may be inferred from proof of past medical services and their value." *Schaefer v. McCreary*, 345 N.W.2d 821, 824 (Neb. 1984).

Dr. Lindley testified that all of the treatment Jackie received under his care, as well as under the care of Drs. Lonser and Perez, was medically necessary to treat the injuries Jackie suffered as a result of the collision. (Trial Ex. 7 at 35:19-36:21.) In contrast, Drs. Essay and Goldner asserted that some of the treatment provided by Drs. Lindley, Lonser, and Perez was not medically necessary. While Dr. Essay's and Dr. Goldner's opinions express their personal preference for certain types of treatment for conditions like Jackie's, these opinions do not preclude Jackie from recovering the value of medical care and supplies reasonably needed and actually provided to her as a result of the collision.

After the collision, Jackie's medical treatment occurred in conservative, incremental, and more invasive steps based upon the ineffectiveness of each treatment. After 10 months of treatment, and when it was evident that none of these treatment modalities brought significant and lasting relief, Dr. Lindley discussed with Jackie a spinal cord stimulator trial. When Dr. Lindley accepted a position as the Director of the Pain Management Fellowship at the University of Miami, Dr. Lonser overtook Jackie's medical treatment, and he also encouraged her to consider a spinal cord stimulator. Because the trial stimulator provided significant pain relief to Jackie, Dr. Lonser not unreasonably recommended the surgical placement of a permanent stimulator. When Dr. Lonser left the pain clinic, Dr. Perez began a new course of treatment consisting of aggressive physical and aqua therapy and extended-release muscle relaxants.

While certain therapies Jackie received may not be preferred treatments in "the majority of circles in pain medicine" for her diagnosis of myofascial pain (Trial Ex. 103, Dep. Phillip E. Essay, M.D., at 18:18-19:8), "everyone is different and in pain management specifically, . . . we really do what we can . . . and try to help them." (Trial Ex. 9, Dep. Pedro Perez, M.D., at 42:6-24, 77:13-18 ("all these invasive modalities . . . it's something we try and see what the result is and I make sure the patient understands this.  So if the patient says . . . I've tried all this and nothing has worked, then I might tell the patient . . . your next step will be to do this. . . . I explain the risks, benefits and explain to them that this might do nothing for them, but it's something we can try and I'll let the patient decide").)  Defendant Allied's contention that Jackie's various medical treatments were not reasonably needed is simply an expression of a debate among physicians regarding the most effective treatment for an elusive pain condition.  As Dr. Goldner stated, "Doctors disagree."  (Trial Ex. 100 at 58:5.)

I conclude that most of the medical treatment Jackie Bowen received as a result of the September 28, 2007, collision was "reasonably needed by and actually provided" to her, NJI2d Civ. 4.01 (West 2012)—however, there are two exceptions.  First,  the cost of Nortriptyline and Amitriptyline are not recoverable because Jackie Bowen was taking Amitriptyline before the accident, and she began taking Nortriptyline as a replacement for the Amitriptyline.  Second, I cannot conclude that the defendant should bear the cost of Jackie Bowen's physical and aqua therapy beyond 90 days of treatment, as physicians for both parties testified that three months of such therapy was appropriate initially, with further evaluation to occur as necessary.  (Trial Ex. 103, Dep. Phillip E. Essay, M.D., at 60:21-61:25 (Plaintiff's physical and aqua therapy was appropriate for 90 days); Trial Ex. 9, Dep. Pedro Perez, M.D., at 70:2-10 ("Usually, after the initial three months of physical therapy or whatever amount of physical therapy the patient can afford . . . we take a break and we see what happens. . . . and if the pain recurs then they have to go back.").)  To continue such therapies "in perpetuity . . . is inappropriate."  (Trial Ex. 103 at 46:15-47:6.)

26

As far as medical treatment reasonably certain to be needed by, and provided to, Jackie Bowen in the future due to her injuries from the car accident, Dr. Perez testified that Jackie's treatment should consist of physical and aqua therapy three times a week, along with prescriptions for Amrix, Nortriptyline, and Flector patches. (Trial Ex. 9 at 124:1-3; Filing 71 at 2:18:25-2:19:30.)   The cost of this treatment would be $4,323.00 per month.

As explained above, I shall not award damages for further physical and aqua therapy or for Jackie Bowen's Nortriptyline prescription.   However, it is reasonably certain that Jackie will need to continue her Amrix and Flector prescriptions. According to Jackie's summarized prescription records, Jackie's Amrix prescription averages $234.34 per month, and her Flector patches cost an average of  $280.67 per month, for a monthly total of $515.01.[16]  (Trial Ex. 2, at pp. 13-15 (under "Walgreen's Pharmacy" heading).)   Because the evidence indicates that Jackie's pain has been unrelenting since the accident, and there is no indication that the pain is likely to diminish or disappear over time, I determine that the Bowens are entitled to damages for this monthly prescription cost for the duration of Jackie Bowen's 37.91-year life expectancy.

### 3.    *Calculation of Damages*[17]

In addition to Jackie's damages for medical care and supplies and lost wages, the plaintiffs also request damages for pain, suffering, and loss of consortium.  These

---

[16]Trial Exhibit 2 shows a total of $4,921.16 in Amrix prescriptions for a period of 21 months, for an average of $234.34 per month.  Exhibit 2 also shows a total of $1,122.69 in Flector prescriptions over a four-month period, for an average of $280.67 per month.  It is not clear whether Jackie's prescriptions for Lidoderm from October 2010 to January 2012 are the same or similar to her Flector prescription, so only the latter was used to calculate the monthly average.

[17]See Trial Exhibit 2 for a summary of Jackie Bowen's medical bills.

types of damages are ones "for which 'the law provides no precise measurement,'" *Carlson v. Okerstrom*, 675 N.W.2d 89, 111 (Neb. 2004) (quoting *Brandon v. County of Richardson*, 653 N.W.2d 829, 837 (2002)), and which "require less certain proof." NJI2d Civ. 4(A)(3)(West 2012).

Jackie described to the court in detail the pervasiveness of pain in her daily life since the date of the accident; the litany of unsuccessful medical procedures, physicians, prescriptions, and types of therapy she has endured since the collision; her daily physical limitations; and the fact that her pain has become, in her words, "part of everything I do and everything that I have become. . . . It is kind of more of a central focus in my life because it's become more debilitating." (Filing 72 at 1:10:29-1:12:48.) The level of Jackie's pain is evident to her husband, who testified that he "can tell when she's pushing through when she's hurting and she's struggling she's just doing it anyway." (Filing 72 at 1:32:11-1:33:23.) Jackie's husband also credibly told the court about how the adverse effects of the collision on Jackie's health have required him to reduce his workload as a church pastor, to increase his domestic responsibilities in the Bowens' seven-person household, and to experience a decrease in marital intimacy.

Based on this testimony, I conclude that Jackie Bowen may recover $25,000 for her pain and suffering, and Stephen Bowen is entitled to $10,000 for loss of consortium. A summary of the damages Plaintiffs have incurred, and will continue to incur, as a result of the September 28, 2007, accident is set forth below:

28

| | |
|---|---|
| Original stipulated medical expenses from date of accident to time of trial | $191,146.65 |
| Subtract physical and aqua therapy provided after 90 days (also subtracting neuromuscular reeducation costs which parties agree should be deleted) | -$53,077.00 |
| Subtract Nortriptyline from prescription drug costs incurred as of time of trial | <u>-$118.63</u> |
| TOTAL ALLOWABLE MEDICAL EXPENSES UP TO DATE OF TRIAL | $137,951.02 |
| Amrix & Flector prescriptions per month for Jackie Bowen's lifetime ($515.01 per month x 12 months = $6,180.12 per year x 37.91 years life expectancy = $234,288.35)[18] | $234,288.35 |
| Stipulated lost wages from date of accident to time of trial | $6,565.00 |
| Jackie's pain & suffering | $25,000 |
| Stephen's loss of consortium | $10,000 |
| TOTAL DAMAGES RESULTING FROM ACCIDENT | $413,804.37 |
| Subtract payment from Shelter Insurance Company on behalf of negligent driver, Chris Moser | -$100,000 |
| **NET AMOUNT OF DAMAGES** | **<u>$313,804.37</u>** |

---

[18]If this gross number is reduced to present value, the net amount of damages shown at the end of this table nevertheless substantially exceeds $250,000.

Therefore, defendant Allied is responsible for paying the Bowens $250,000 pursuant to the underinsured motor vehicle benefits provision of insurance policy number PPC 0014076466-3 issued by Allied to the Bowens.  Accordingly,

IT IS ORDERED:

1.    Defendant Allied Property and Casualty Insurance Company's Motion to Exclude (Filing 52) evidence of plaintiff Stephen T. Bowen's alleged loss of consortium is denied.

2.    Defendant Allied Property and Casualty Insurance Company's statement of objections (Filing 66) to Magistrate Judge Zwart's order (Filing 65) regarding the exclusion of supplemental expert opinions offered by Dr. Phillip Essay is denied.

3.    Judgment shall be entered in favor of plaintiffs Jacqueline and Stephen Bowen and against defendant Allied Property and Casualty Insurance Company in the amount of $250,000, the underinsured motorist coverage amount contained in automobile insurance policy number PPC 0014076466-3 issued by defendantAllied to the plaintiffs.  However, judgment shall be withheld pending resolution of the issue of attorneys' fees.

4.    The plaintiffs may file an application for reasonable attorneys' fees pursuant to Neb. Rev. Stat. § 44-359[19] and the Local Rules of Practice of the United States District Court for the District of Nebraska on or before December 20, 2012.

---

[19]Neb. Rev. Stat. § 44-359 provides in part: "In all cases when the beneficiary . . . brings an action upon any type of insurance policy . . . against any company . . . doing business in this state, the court, upon rendering judgment against such company, . . . shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs."

The defendant may file a response to such application on or before January 3, 2013, and the plaintiffs may file a reply on or before January 10, 2013.

DATED this 6th day of December, 2012.

BY THE COURT:

*Richard G. Kopf*

Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.